UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
TWELVE ADAMS STREET, NW,
WASHINGTON, D.C. 20001

Misc. No. _____

<u>UNDER SEAL</u>

<u>**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**</u>

I, **Shawn Matthews**, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as Twelve Adams Street, Northwest, Washington, D.C. 20001 hereinafter "the PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been employed with for 11 years. Prior to my work with the FBI, I was a Fayetteville, West Virginia police officer for 3 years, and a City of Roanoke Police Officer for 4 years working in law enforcement. I have a Bachelor Degree in Criminal Behavior, and a Master's Degree in Administration of Justice. Additionally, I have received specialized training in the FBI relevant to the investigation of computer related crimes to include computer forensics training. I have experience and specialized training related the collection of computer related evidence, and I have personally participated in search warrants involving the search and seizure of computer related equipment. As a federal agent, I am authorized to investigate violations of laws of the

United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.     The facts of this affidavit come from my personal observations, my training and experience, and from information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

4.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by l8 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a "district court of the United States ... that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

5.     Title 18, United States Code, Section 922(g)(3) states in relevant part: "It shall be unlawful for any person . . . who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

6.     Title 18, United States Code, Section 241 states in relevant part: "If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so

exercised the same; . . . They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section . . .  they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death."

7.      On October 27, 2018, Robert Bowers, a self-proclaimed white supremacist, attacked the Tree-of-Life Synagogue in Pittsburgh, Pennsylvania, killing 11 members of the synagogue. Bowers used an assault rifle in the attack on the Tree-of-Life Synagogue. Bower's attack was defined as a hate crime by the Federal Bureau of Investigation (FBI).

8.      The ongoing investigation regarding Bowers has revealed that shortly before he entered the Synagogue and began shooting, Bowers posted a message on a social networking site named "Gab" using the username "@onedingo." Specifically, Bower's post stated, "HIAS likes to bring invaders in that kill our people. I can't sit by and watch my people get slaughtered. Screw your optics. I'm going in."[1]

9.      The FBI's investigation of Bowers revealed that Bowers' "friends" on Gab included a District of Columbia resident, Jeffery Raphiel Clark Jr., who resides at the PREMISES.  Jeffery Clark resided at the PREMISES with his father, sister, and younger brother, Edward William "Teddy" Clark.

10.      On October 27, 2018, following Bowers' attack on the Tree-of-life Synagogue, news media outlets and online sources reported that Gab intended to cooperate with federal law

---

[1] According the website for HIAS, "HIAS works around the world to protect refugees who have been forced to flee their homelands because of who they are, including ethnic, religious, and sexual minorities. For more than 130 years, HIAS has been helping refugees rebuild their lives in safety and dignity."

enforcement authorities in their investigation of Bowers. Later that same evening, Edward "Teddy" Clark went to Theodore Roosevelt Island in Washington D.C. and committed suicide. Edward Clark killed himself with a Berretta pistol. Officers who responded to the scene discovered that in addition to the nine remaining rounds contained in the magazine of Clark's Berretta pistol, Edward Clark also possessed two additional magazines of ammunition containing 20 additional rounds of ammunition. Officers did not locate a suicide note, but did locate and seize a cell phone from Edward Clark. Edward Clark was 23 years old.

11.     On November 2, 2018, the Washington Field Office (WFO) Command and Tactical Operations Center (CTOC) received a call from W-1 and W-2 pertaining to their nephews Jeffery and Edward Clark. W-1 and W-2 reported that Jeffery and Edward Clark had been heavily involved in the "Alt-Right" movement, and that they were connected with the Pittsburgh Synagogue Shooter through Gab. After the death of Edward Clark, Jeffery Clark became more outspoken about his radical views, expressing them openly to his family members who were in the area for Edward Clark's funeral. During these conversations, Jeffery Clark defended Robert Bowers' killings at the Tree-of-Life Synagogue. Jeffery Clark also stated that he and Edward Clark had both fanaticized about killing "Jews and blacks".

12.     W-1 and W-2 stated that Jeffery Clark had been "really riled up" and "agitated," and they called the FBI out of concern that he could be a danger to himself or others. W-1 and W-2 were so concerned that they went to Jeffery Clark's residence (the PREMISES) to check on their nephew and to confiscate his firearms. Jeffery Clark gave them four boxes which they took to their home for safe keeping. As described below, those boxes did not contain any firearms, but did contain parts to weapons that are not registered to either Jeffery or Edward Clark.

13.     On November 2, 2018, WFO Joint Terrorism Task Force (JTTF), Special Agent (SA) and Task Force Officers (TFO) interviewed W-1 and W-2, and other family members who were attending the funeral of Edward Clark. W-1 and W-2 stated that Jeffery and Edward Clark were heavily involved in the white nationalist movement. According to W-1 and W-2, both Jeffery and Edward Clark attended the 2017 "Unite the Right" rally in Charlottesville, Virginia. W-1 and W-2 believe that there are photos online of them standing next to James Fields, the white nationalist who drove a car into a crowd of protestors in Charlottesville, Virginia, killing one person and injuring nineteen. According to W-1 and W-2, Jeffery and Edward Clark openly discussed killing Jews and black people, and openly admired Timothy McVeigh, Ted Kaczynski, and Charles Manson. According to W-1 and W-2, Jeffery and Edward Clark believed that there would be a race revolution, and they wanted to expedite it.

14.     In regard to the shooting at the Tree-of-Life Synagogue, Jeffery Clark stated that the victims deserved it. Jeffery Clark believed that a homosexual Jewish couple was having an adopted baby circumcised that week, and that justified Bowers' actions.

15.     W-1 and W-2 showed the interviewing agents a photo of Jeffery and Edward Clark holding a flag. Your affiant recognized this flag as the flag of Vanguard America ("VA") (Attachment C). The Southern Poverty Law Center describes VA as:

> A white supremacist group that opposes multiculturalism and believes that America should be an exclusively white nation.  Their right-wing nationalist slogan, 'Blood and Soil,' romanticizes the notion that people with 'white blood' have a special bond with 'American soil.' This philosophy originated in Germany (as Blut und Boden) and was popularized by Hitler's regime. VA uses 'For Race and Nation' as an alternative slogan. Along those lines, the VA manifesto (as of April 2018) maintains that 'The racial stock of this nation was created for white Christian Anglo/Europeans by white Christian Anglo/Europeans. All other ethnicities, races, religions and demographics are absolutely not compatible with this nation's original culture… VA has also warned against the influence of 'the international Jew,' tweeting in July 2017, 'Those behind the subversive

5

elements eroding our culture often have something in common. Jewish influence is prevalent, invasive, and dangerous.' This theme is echoed in their 2018 manifesto, which states that 'Islam, Judaism and all other non-European or foreign religions' should not have the freedom to practice in the United States.

16.     W-1 and W-2 stated that their family has a history of depression, but they were not aware of any indications that Edward Clark would commit suicide. Further, W-1 and W-2 did not know why Edward William Clark had so many bullets with him, but they believed he may have been planning to commit an act of violence on the day that he died.

17.     On or about November 8, 2018, W-2 also informed agents that Jeffery Clark had engaged in unusual behavior on October 27, 2018. According to W-2, Jeffery Clark woke up around noon on October 27, 2018, (after the Tree-of-Life Synagogue shooting) and discovered that Edward was not home. Despite the fact that Edward Clark was 23 years old, Jeffery Clark called his mother to report that Edward was missing, and reported to his mother than he was going to call the police to report Edward missing.

## Specific Information Related to Drug Use

18.     W-1 and W-2 also told agents that Jeffery Clark needs medical treatment and needs to detox from drug use. According to W-1 and W-2, Jeffery Clark and Edward Clark would stay at home a lot, smoke marijuana, and play video games such as "Ethnic Cleansing." They were not aware of any other kinds of drug use, but believed it was possible based on of their behavior. W-1 and W-2 also stated that Jeffery Clark was involved in selling marijuana.[2]

---

[2] W-2 later stated that Jeffery Clark had tried to stop smoking marijuana when he became active in the white supremacist movement, but he was not successful in doing so. Another family member also stated that Jeffery and Edward Clark talked openly about their drug use, and that the PREMISES often smelled of marijuana.

19.     On November 8, 2018, agents conducted a further interview with W-2. During that interview, W-2 stated that she had smelled marijuana in the PREMISES as recently as October 27, 2018, and November 4, 2018. W-2 also reported that during this period she observed two propane torches in the kitchen area of the PREMISES. When W-2 asked Jeffery Clark whether the torches were for soldering, he just smiled. Your affiant is aware that propane torches such as those described by W-2 are consistent with those used for smoking methamphetamine. Your affiant notes that Jeffery Clark's Gab profile page includes the following description of himself: "Meth-Smoking, Pipe Bomb making, mailman-murding,#Fed,#DemoKKKrat, Che Guevara of the altright."

20.     A criminal records check disclosed that in May of 2008 Jeffrey Clark was charged by the U.S. Park Police with possession of marijuana and distribution of marijuana, however, both of those cases were no-papered.

### Specific Information Regarding Firearms

21.     A review of records maintained by the District of Columbia revealed that four guns were  registered to the Clark brothers. Jeffrey Clark is the registered owner of a Remington Arms 1911 R1 handgun, and a Mossberg Maverick 88 shotgun. Edward Clark was the registered owner of a Beretta 92FS handgun, and a Ruger Mini 14 Ranch Rifle. Edward Clark's Beretta handgun was recovered at the scene of his apparent suicide on October 27, 2018.

22.     W-1 and W-2 showed agents the four boxes of gun parts that they had obtained from Jeffery Clark. Upon inspection of the boxes, agents observed that they were filled with gun parts, but no functional firearms. Agents recognized several items in the boxes as parts used to modify AR-15 assault rifles, including parts that would modify an AR-15 rifle to fire .223

rounds. Based on your affiant's training and experience, these parts could not be used to modify any of the firearms that are registered to the Clark brothers in the District of Columbia.

**Specific Information Related to Gab**

23.     Your Affiant has learned that Jeffery Clark would communicate with users on "Gab." Gab owns and operates a free-access social-networking website of the same name that can be accessed at http://www.Gab.com. Gab allows its users to create their own profile pages, which can include a short biography, and a photo of themselves. Gab also permits users to create and read 300-character messages called "Gab," and to restrict their "Gabs" to individuals with whom they approve. Upon creating a Gab account, a Gab user must create a unique Gab username and an account password, and the user may also select a different "display name" of 20 characters or fewer to identify his or her Gab account. The Gab user may also change this username, password, and display name without having to open a new Gab account.

24.     A Gab user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Gab users can post "bios" of 160 characters or fewer to their profile pages. In addition, when a Gab includes a Gab username, often preceded by the @ sign, Gab designates that Gab a "mention" of the identified user.

25.     On October 27, 2018, after learning of his brother's suicide, Jeffery Clark told W-1 and W-2 that he thought the synagogue shooter (Bowers) had friended him on Gab.

26.     On or about November 4, 2018, Jeffery Clark told W-2 that he expected the FBI to "show up" because of his contacts with Bowers on Gab. During this conversation, Jeffery

Clark told W-2 "they (an apparent reference to VA) had not broken any laws, but at some point if a line gets crossed, I would be violent, everyone has a line, including you."

27.     The FBI's investigation into Bowers confirmed that Bowers and Jeffery Clark were friends on Gab. According to FBI database searches, Jeffery Clark has had communication with at least two other FBI predicated subjects online and by phone.

28.     Your affiant has identified Jeffery Clark's Gab username as "DC Bowl Gang."[3] Your affiant also has reason to believe that the Gab username for Edward Clark was "DC_Stormer." Your affiant viewed Jeffery Clark's Gab profile page following Edward Clark's death. Jeffery Clark's profile picture includes a photograph of Jeffery and Edward Clark wearing masks and holding what appear to be the Mossberg Maverick 88 shotgun and the Ruger Mini 14 Ranch Rifle that were registered in the District of Columbia. The Clark brothers are posing in front of a flag with a skull and crossbones. The skull has what appears to be a bowl-style haircut. Superimposed over this photograph is an image of Dylann Roof (Attachment D).[4]

29.     On his profile page, Jeffery Clark describes himself as: "Aka DC Stormer (RIP), Meth-Smoking, Pipe Bomb making, mailman-murding,#Fed,#DemoKKKrat, Che Guevara of the altright, Glenn beck, Not a NEET – just bathing in White privilege, Bowlcut Nationalism is the only way forward . . ."  (Attachment E).

---

[3] Your affiant believes that the term "bowl gang" is a reference to the bowl-style haircut of Dylann Roof.

[4] Dylann Roof was found guilty of 33 counts, including nine counts of murder in connection with the June 17, 2015, massacre at Emanuel African Methodist Episcopal Church in South Carolina.

30.     In one of Jeffery Clark's Gab posts he states that the "fucking kikes that got shot by the hero #RobertBowers were all active supporters of pedophilia… and every last one of them deserved exactly what happened to them and so much worse."

31.     Another post in Jeffery Clark's Gab account shows a picture of Robert Bowers, armed with a gun, splattered in what appears to be blood, followed by the following post by Clark: "Nah he was BASED! Get used to it libtards. This was a dry run for things to come." (Attachment F).

### Connection to the Location to be Searched

32.     Interviews with family members, as well as firearms registrations from the District of Columbia, establish that Jeffery Clark resides at twelve Adams Street Northwest, Washington D.C. further described as the PREMISES. There is probable cause to believe that the PREMISES to be searched has evidence, fruits of the crime, instrumentalities, or contraband pertaining to weapons, narcotics use, and violent acts.

### Digital Devices

33.     The Digital Devices to be seized are any storage media, computers, phones, tablets, or computer hardware further describe as Digital Devices. There is probable cause to believe that property to be seized could contain computers or digital devices used for planning, researching, encouraging, or aiding in an attack against individuals or institutions based on their race and constitutionally protected religious beliefs.  Digital devices used to purchase or attempt to purchase weapons, or conduct preplanning.  As discussed above, Jeffery Clark was a "friend" of Robert Bowers on Gab as well as other FBI predicated subjects. Further, Jeffery Clark expressed concern that the FBI would approach him because of his contacts with Bowers.

Further, after it was publicly announced that Gab was cooperating with federal authorities, Edward Clark, who also used Gab, appears to have committed suicide after arming himself with a handgun and 30 rounds of ammunition.

### TECHNICAL TERMS

Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously:  storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning

system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data

security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of

the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.   Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be

downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

      i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

      o.     "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network- hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

1.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices,

such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a.	Individuals who engage in criminal activity, may use  digital devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device(s), documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts;

b.	Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

2.      As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that

establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.          Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other

digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.         Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.         A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.         The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how

the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.         Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.         I know that when an individual uses a digital device to commit violations such as a violation of Title 18, United States Code, Section 241, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  .

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

3.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.         Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form

of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

   d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and

user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

4.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.     Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices, within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain

(analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.   In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.   Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

5.      Law enforcement personnel will commence the execution of this search and seizure warrant upon the PREMISES during daytime hours (between 6:00 a.m. and 10:00 p.m.), as early as practicable.   It is anticipated that law enforcement personnel will attempt to image or copy digital information from certain servers on the PREMISES, rather than remove those servers from the premises.   Such onsite imaging or copying will minimize disruptions to the use of those servers.

## **CONCLUSION**

6.      I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,


_____

Shawn Matthews,  Special Agent, FBI



Subscribed and sworn to before me
on November 9, 2018:

_____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE